# COURT OF APPEALS OF VIRGINIA

## Record No. 0011-25-1

ESSONIE NAISEAN DA'SIR LENNON

v.

COMMONWEALTH OF VIRGINIA

Present: Judges Malveaux, Friedman and Lorish

Argued at Norfolk, Virginia

Opinion Issued August 11, 2026[*]

## FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Charles J. Maxfield, Judge Designate

Charles E. Haden for appellant.

Matthew J. Beyrau, Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

## MEMORANDUM OPINION BY
## JUDGE MARY BENNETT MALVEAUX

A jury convicted Essonie Naisean Da'Sir Lennon of first-degree murder, in violation of Code § 18.2-32, attempted robbery causing death, in violation of Code §§ 18.2-26 and -58, unlawfully shooting at an occupied vehicle, in violation of Code § 18.2-154, two counts of abduction, in violation of Code § 18.2-47, three counts of using a firearm in the commission of a felony, in violation of Code § 18.2-53.1, two counts of shooting a person in the commission of a felony, in violation of Code § 18.2-53, and possessing a firearm as a juvenile, in violation of Code § 18.2-308.7. On appeal, Lennon argues that the trial court erred in: (1) denying his motion to strike the evidence; (2) admitting a Cellebrite report into evidence; and (3) denying his

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

motion to strike a juror for cause. Finding no error, we affirm the convictions, but we vacate the sentencing order in part and remand for resentencing.

BACKGROUND

We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). In doing so, we discard any evidence that conflicts with the Commonwealth's evidence, and regard as true all the credible evidence favorable to the Commonwealth and all inferences that can be fairly drawn from that evidence. *Cady*, 300 Va. at 329.

The Offense

On the evening of December 23, 2021, Javont "Jay" Berro and Michael Neblett stopped at a Wawa gas station near the Autumn Lakes apartment complex in Newport News because Neblett had "to make a sale of marijuana to somebody." At the time of the offense, Berro was 17 years old and Neblett was 24 years old. Neblett parked his car in the back parking lot and began texting on his cell phone. Berro saw a profile picture of Lennon on Neblett's phone screen and a profile name of "Soni." Berro recognized Lennon's picture because they had gone to middle school together, and he thought that Neblett and Lennon were messaging each other.

Neblett and Berro waited in the car for approximately 15 minutes before Lennon "walk[ed] up" to the car. Lennon opened the rear driver's side door and sat down behind Neblett. Lennon left the door open and stuck his left foot outside of the car, which caused a light in the car to illuminate. Berro recognized Lennon as the person entering the car because he had a "very distinguishable look." Lennon was wearing dark clothing, but no gloves or mask.

While in the back seat of the car, Lennon showed Neblett money, and Neblett showed him some marijuana. When Neblett handed the marijuana to him, Lennon quickly pulled out a

- 2 -

gun and pointed it at Neblett. Lennon told Neblett, "You already know what time it is, bitch," and then stepped out of the vehicle. With his gun still pointed at Neblett, Lennon walked to the driver's side window and told Neblett to "[g]ive it up" and "[d]rop it." Lennon also told Neblett, "[d]on't reach." Neblett had a gun in his lap at the time.

After Lennon made these statements, Berro, who was sitting in the front passenger seat, heard the loud "boom" and saw a flash resulting from Lennon shooting Neblett. He then saw Neblett get out of the car and chase Lennon. Neblett fired his gun at Lennon in return but then collapsed. Berro left the car to help Neblett, who was lying on the sidewalk and felt like "dead weight" when Berro tried to help him stand.

Berro then took Neblett's gun and drove to his parents' house and told them about the shooting. After officers arrived at Berro's home, police collected Neblett's phone and gun. A police detective showed Berro a photo lineup. Berro identified Lennon as the shooter, saying "Yes, sir, A1, 10 out 10, top tier, that's that boy."

Another police detective went to the Autumn Lakes apartment complex and found Neblett without a pulse and with two gunshot wounds in his chest. Medics transported Neblett to a hospital, where he was pronounced dead. The medical examiner who performed Neblett's autopsy determined that the cause of death was the gunshot wounds to his chest and right arm. The bullet entered the left side of his chest in a downward direction, went through both lungs and his heart, and exited and lodged in his right arm. The bullet was turned over to the police. The medical examiner confirmed that there was no intervening or earlier cause of death. She also opined that a person shot through the heart typically had approximately 20 seconds of conscious life, followed by 2 to 3 minutes of unconscious life and then death. She further opined that Neblett—who had been shot in the lungs and the heart—would have been able "to speak or move very briefly . . . but it wouldn't [have] be[en] long."

Five days after the shooting, during a search of Lennon's home, police found a loaded .9 millimeter Ruger handgun in a toilet tank. A blue iPhone and another cell phone were found on the floor in a bedroom. Brenda Lennon, Lennon's mother, identified the blue iPhone found during the search as belonging to her. Lennon had taken her phone when he left home on the night of the shooting, and she had not seen it again until the officers found it at Lennon's apartment.

Police performed a data extraction on the blue iPhone. Due to security measures in place on the iPhone, only a "partial" amount of data was obtained. A Cellebrite report was also generated from the partial data recovered. The report included some "identifying information," including an email account for "Sonivito@icloud.com."

Another police detective later performed a "more complete" data extraction from Neblett's cell phone. He generated a Cellebrite report which showed messages sent on the night of the shooting between Neblett's Instagram account and another Instagram account with the username "Soni.gotaim" that had "Sonivito@icloud.com" as the email address associated with the account. "Soni" messaged Neblett at 9:14 p.m. "Yu can come now," and Neblett replied, "Ight wya ? An u got cash ?" "Soni" stated that he had the cash and they agreed to meet at Wawa. At 9:51 p.m., "Soni" messaged to ask "[w]at car" Neblett was in, and Neblett replied that he was in the "[r]ed" one. After that, there were no additional messages between the accounts.

Police forensic evidence technicians collected additional evidence from the location of the shooting and Lennon's apartment. In Lennon's apartment, the technicians found another firearm, a Springfield Armory XDS-9 handgun loaded with an XDS-9 magazine containing four .9-millimeter Luger cartridges. Evidence from the crime scene included four .9-millimeter Luger cartridge casings. A Virginia Department of Forensic Science firearm and toolmark examiner opined that the bullet from Neblett's body exhibited the same class characteristics as those

- 4 -

produced by the handgun found in the toilet tank, but he "could not identify, nor could [he] eliminate that firearm as having been used to fire th[e] bullet."

Lennon was indicted for first-degree murder, three counts of using a firearm in the commission of a felony, two counts of abduction, attempted robbery causing death, possession of a firearm by a juvenile, shooting into an occupied vehicle, and two counts of shooting a person in the commission of a felony.[2]

Proceedings at Trial

During jury selection, the Commonwealth read the names of its potential witnesses and asked the members of the venire if they knew anyone on the list. Juror 19 said that Amy Jango, a potential witness from the Virginia Department of Forensic Science, was her sister-in-law. Juror 19 stated that she "could be fair and impartial during [Jango's] testimony and to both parties." Lennon moved to strike Juror 19 for cause. He argued that the juror's "relationship and familial interaction with one of the Commonwealth's witnesses . . . would be problematic." Lennon contended that "as a prima facie matter, [it was] inappropriate for family members of witnesses to sit when [there was] a swath of uninvolved persons" in the venire. The Commonwealth countered that Juror 19 "ha[d] indicated, clearly, that she could be fair and impartial" and noted that "Jango [was] not on [its] primary list of witnesses," and it was not "positive" that she would be called as a witness.

The trial court denied Lennon's motion to strike Juror 19 for cause, noting that she had said that she could be "fair and impartial." Lennon did not use a peremptory strike to remove Juror 19, and she was ultimately selected for the jury. Jango was not called as a witness by either party during the trial.

_____

[2] Lennon was 17 years old at the time of the offense. The initial charging papers were issued as petitions by the Newport News Juvenile and Domestic Relations District Court.

At trial, Berro identified Lennon as the shooter. He testified that Lennon made Neblett drop the marijuana while pointing the gun at him. He also testified that he was scared and thought he "was going to pretty much die" when he saw Lennon's gun. He stated that he felt that he could not leave the car once Lennon pointed the gun at Neblett.

The Commonwealth played surveillance footage from the Autumn Lakes apartment complex. That footage contained audio of a single gunshot and video of Lennon running from the Wawa and across the street with a gun in his hand, and then Neblett chasing Lennon, firing a gunshot in his direction, and then collapsing on the sidewalk. Berro identified Lennon as the person running away and Neblett as the body on the ground, and also identified Lennon in still shot photographs taken from the surveillance video. He further testified that he had "[n]o doubts whatsoever" that Lennon shot Neblett.

Lennon objected to the admission of the Cellebrite report from Neblett's phone containing the Instagram messages between Neblett and "Soni." He argued that the messages were inadmissible because there was "[in]sufficient linkage between the Instagram handle" for "Soni" and "the identity of the person [who] typ[ed] those statements or inputt[ed] them into whatever program." The Commonwealth argued that the Cellebrite report was admissible because it had established, by a preponderance of the evidence, that Lennon was "Soni." The trial court overruled Lennon's objection.

At the conclusion of the Commonwealth's evidence, Lennon moved to strike, arguing that no evidence identified him as the shooter except for Berro's account which was "problematic and wanton." The trial court denied the motion.

Lennon did not present evidence and renewed his motion to strike on the same grounds. The trial court denied the motion. The jury convicted Lennon of all the charged offenses. Lennon now appeals.

ANALYSIS

I. Motion to Strike

Lennon argues that trial court erred in denying his motion to strike because Berro's "dubious account of the shooting" did not establish that he robbed and killed Neblett.

"In the context of a jury trial, a trial court does 'not err in denying [a] motion to strike the evidence [when] the Commonwealth present[s] a *prima facie* case for consideration by the fact finder.'" *Vay v. Commonwealth*, 67 Va. App. 236, 249 (2017) (alterations in original) (quoting *Hawkins v. Commonwealth*, 64 Va. App. 650, 657 (2015)). Whether the evidence is sufficient to prove each element of a crime "is a factual finding, which will not be set aside on appeal unless it is plainly wrong." *Id.* (quoting *Linnon v. Commonwealth*, 287 Va. 92, 98 (2014)).

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). "Thus, 'it is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion.'" *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)).

The question on appeal is not if the Court believes the evidence at trial was sufficient, but rather if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Cappe v. Commonwealth*, 79 Va. App. 387, 398 (2024) (quoting *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan v.*

*Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

"At trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Shahan v. Commonwealth*, 76 Va. App. 246, 258 (2022) (quoting *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013)). On appeal, "[w]e review the fact finder's determination regarding the identity of the perpetrator considering 'the totality of the circumstances.'" *Id.* (quoting *Brown v. Commonwealth*, 37 Va. App. 507, 523 (2002)).

We conclude that the trial court did not err in denying Lennon's motion to strike because the evidence was sufficient to establish Lennon's identity as the perpetrator. Here, Berro recognized Lennon as the person Neblett was texting about selling him marijuana, recalling the screen name "Soni." He was seated in the front passenger seat and could see a photograph of Lennon on Neblett's phone as his contact photo. Berro knew Lennon from middle school and recalled his distinctive features. He identified Lennon as the individual who entered the back seat of the car, keeping the door open so the car light was illuminated. Berro saw Lennon draw his gun during the drug transaction. He saw Lennon exit the car, heard him order Neblett to drop the marijuana, and then shoot Neblett in the chest through the open window. He also saw a flash and heard the "boom" of the gun shot, and saw Lennon flee as Neblett tried to chase him.

Berro identified Lennon out of a photo array within hours of the shooting. He also identified Lennon in the surveillance video and photograph from the Autumn Lakes apartment complex. He further identified him in court during the trial.

In addition, Neblett's Instagram data corroborated Berro's account of Neblett messaging Lennon shortly before the shooting. A firearm capable of firing the bullet found in Neblett's body was found hidden in a toilet tank at Lennon's apartment. Lennon's mother claimed ownership of the blue iPhone found at the apartment but clarified that Lennon had taken it from her hours before

- 8 -

the shooting. Simply put, the issues Lennon raises on brief, including Berro's credibility as a witness, were appropriately submitted to and weighed by the jury. *See Thomas v. Commonwealth*, 44 Va. App. 741, 754 (2005) ("We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill." (quoting *Curtis v. Commonwealth*, 11 Va. App. 28, 33 (1990))). These circumstances, in their totality, support the jury's determination that Lennon was the perpetrator.

II. Admission of the Cellebrite Report

Lennon argues that the trial court erred in admitting the Cellebrite report containing the contents of Neblett's cell phone. He argues that it was inadmissible because the Instagram messages from "Soni" to Neblett in the report were not properly authenticated.

"Decisions regarding the admissibility of evidence 'lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion.'" *Blankenship v. Commonwealth*, 69 Va. App. 692, 697 (2019) (quoting *Michels v. Commonwealth*, 47 Va. App. 461, 465 (2006)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Bista v. Commonwealth*, 303 Va. 354, 370 (2024) (quoting *Commonwealth v. Swann*, 290 Va. 194, 197 (2015)).

"The proponent of the evidence bears the burden of establishing . . . the facts necessary to support its admissibility." *Church v. Commonwealth*, 71 Va. App. 107, 122 (2019) (alteration in original) (quoting *Perry v. Commonwealth*, 61 Va. App. 502, 509 (2013)). "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the thing in question is what its proponent claims." Va. R. Evid. 2:901. "The measure of the burden of proof with respect to factual questions underlying the admissibility of evidence is proof by a preponderance of the evidence." *Atkins v. Commonwealth*, 68 Va. App. 1, 9 (2017) (quoting *Bloom v. Commonwealth*, 262 Va. 814, 821 (2001)). "Although

the type of evidence used to prove the identity of the person making the statement may vary based in part upon the medium used to convey the message, the governing legal standard is the same—proof by a preponderance of direct evidence, circumstantial evidence, or a combination of both." *Id.* "Further, it is well established that '[t]he completeness of the identification goes to the weight' afforded 'the evidence rather than its admissibility,' with the responsibility of determining the threshold question of admissibility resting with the trial court." *Id.* (alteration in original) (quoting *Armes v. Commonwealth*, 3 Va. App. 189, 193 (1986)).

Under the applicable preponderance of the evidence standard, the record supports the trial court's determination that Lennon was the person messaging Neblett on the night of the shooting. Lennon's mother reported that Lennon had taken her blue iPhone earlier that day and she had not seen it again until it was retrieved during a search of Lennon's apartment. One of the email accounts associated with the iPhone was Sonivito@icloud.com. Both the email address and the Instagram username, "Soni," are similar to Lennon's first name, Essonie. In addition, Berro reported that he saw "Soni" as the screen name when Neblett was messaging before the shooting, and he recognized Lennon's picture on the screen. Lennon arrived at the Wawa parking lot at the same time "Soni" said he would arrive. By a preponderance of the evidence, the jury reasonably concluded that Lennon used his mother's iPhone to communicate with Neblett as "Soni." Authentication "does not set a high barrier to admissibility, and is generally satisfied by any form of proof that supports a finding that it is what it purports to be." *Id.* Accordingly, the trial court did not err in admitting the Cellebrite repot.

III.  Motion to Strike Juror 19

Lennon contends that the trial court erred in denying his motion to strike Juror 19.

A criminal defendant has a constitutional right to be tried "by an impartial jury." U.S. Const. amend. VI; Va. Const. art. I, § 8. It is the trial court's responsibility to ensure that jurors

are free from bias. *See Griffin v. Commonwealth*, 19 Va. App. 619, 621 (1995). Thus, if it "appear[s] to the court that the [prospective] juror does not stand indifferent in the cause, another [juror] shall be drawn or called and placed in his stead for the trial of that case." Code § 8.01-358. A potential juror should be struck for cause if that person "has any interest in the cause, or is related to either party, or has expressed or formed any opinion, or is sensible of any bias or prejudice." *Mayfield v. Commonwealth*, 59 Va. App. 839, 845 (2012) (quoting *Townsend v. Commonwealth*, 270 Va. 325, 330 (2005)); *see* Rule 3A:14. Moreover, "[t]he opinion entertained by a juror, which disqualifies him, is an opinion of that fixed character which repels the presumption of innocence in a criminal case, and in whose mind the accused stands condemned already." *Huguely v. Commonwealth*, 63 Va. App. 92, 120-21 (2014) (quoting *Justus v. Commonwealth*, 220 Va. 971, 976 (1980)).

An appellate court "defer[s] to the [trial] court's determination whether to exclude a prospective juror because that court was able to see and hear each member of the venire respond to questions posed." *Townsend*, 270 Va. at 329 (quoting *Green v. Commonwealth*, 262 Va. 105, 115 (2001)). "Juror impartiality is a question of fact." *Huguely*, 63 Va. App. at 121 (quoting *Lovos-Rivas v. Commonwealth*, 58 Va. App. 55, 61 (2011)). The "decision to retain or exclude a prospective juror 'will not be disturbed on appeal unless there has been manifest error amounting to an abuse of discretion.'" *Lovos-Rivas*, 58 Va. App. at 61 (quoting *Barrett v. Commonwealth*, 262 Va. 823, 826 (2001)).

Lennon contends that the trial court abused its discretion when it refused to strike Juror 19 for cause because during voir dire, Juror 19 disclosed that she was the sister-in-law of a potential Commonwealth witness, Amy Jango. We disagree.

As an initial matter, in Virginia, there is no per se rule disqualifying a prospective juror who is related to a Commonwealth witness on the grounds that she is presumed to be biased or

not indifferent in the cause. *Barrett*, 262 Va. at 826; *see also Townsend*, 270 Va. at 331. Here, Juror 19 stated that she would be "fair and impartial during [Jango's] testimony and to both parties." Her response demonstrated that she stood "indifferent in the cause." *Mayfield*, 59 Va. App. at 845 (quoting Code § 8.01-358).

In addition, although it is "prejudicial error for the trial court to force a defendant to use [a] peremptory strike[] to exclude a venireman from the jury panel if that person is not free from exception," Lennon did not use a peremptory strike to exclude Juror 19 from the venire after his motion was denied. *Townsend*, 270 Va. at 329. And here it is also important to note that Jango did not testify. Lennon cites no cases, and we find none, requiring that a juror related to a non-testifying individual be struck for cause. For these reasons, we conclude that the trial court did not abuse its discretion in denying Lennon's motion to strike Juror 19.

IV. Sentencing Order

While we affirm Lennon's convictions, we remand for a correction of the sentencing order and for resentencing within the statutory limits on three of his convictions.

"[A] sentence imposed in violation of a prescribed statutory range of punishment is void *ab initio* because 'the character of the judgment was not such as the [C]ourt had the power to render.'" *Rawls v. Commonwealth*, 278 Va. 213, 221 (2009) (second alteration in original) (quoting *Anthony v. Kasey*, 83 Va. 338, 340 (1887)). "Objections to void ab initio judgments may be raised by any party in the case at any point during a valid direct or collateral proceeding where the voidness of the order is properly at issue, including by a court for the first time on appeal." *Hannah v. Commonwealth*, 303 Va. 106, 120 (2024).

Lennon was indicted for maliciously shooting at an occupied vehicle, in violation of Code § 18.2-154. The jury verdict form, as well as the verdict announcement at trial, demonstrate that the jury found Lennon guilty of the lesser-included offense of unlawfully

shooting at an occupied vehicle, in violation of Code § 18.2-154. The conviction and sentencing orders, however, both reflect that Lennon was convicted of maliciously shooting at an occupied vehicle. We remand to the trial court to correct the conviction and sentencing orders under Code § 8.01-428(B) to reflect the jury's actual conviction of unlawful and not malicious shooting at an occupied vehicle. "[T]rial courts speak only through their orders and . . . such orders are presumed to reflect accurately what transpired." *Rose v. Commonwealth*, 265 Va. 430, 435 n.2 (2003) (quoting *McMillion v. Dryvit Sys., Inc.*, 262 Va. 463, 469 (2001)). But if "the record unquestionably refutes the order's recital," the order is not binding. *Jones v. Commonwealth*, 24 Va. App. 636, 640 (1997). Moreover, the trial court imposed a 20-year sentence for the purported maliciously shooting at an occupied vehicle conviction. Pursuant to Code § 18.2-154, unlawfully shooting at an occupied vehicle is a Class 6 felony, punishable by "a term of imprisonment of not less than one year nor more than five years." Code § 18.2-10(f). Lennon's sentencing order is void ab initio to the extent that it sentenced him in excess of five years on his conviction for unlawfully shooting at an occupied vehicle.

In addition, Lennon was indicted for and convicted of attempted robbery causing death, in violation of Code §§ 18.2-26, -58. He was sentenced to 20 years' imprisonment by the trial court for this conviction. While robbery causing death is Class 2 felony that can be punished by "imprisonment for life or for any term not less than 20 years," a conviction for *attempted* robbery causing death is a Class 4 felony that can be punished by "a term of imprisonment of not less than two years nor more than 10 years." Code §§ 18.2-10, -26, -58. The attempted robbery causing death sentence given by the trial court exceeds the statutory limit and is likewise void ab initio.

Further, Lennon was found guilty of possessing a firearm as a juvenile, in violation of Code § 18.2-308.7, a Class 1 misdemeanor. "[A]uthorized punishments" for Class 1

misdemeanor convictions include "confinement in jail for not more than twelve months." Code § 18.2-11. However, the trial court sentenced Lennon to "[i]ncarceration with the Virginia Department of Corrections for the term of 1 years" for this offense. As this sentence is also outside the statutorily prescribed range of punishment, we remand to the trial court for resentencing on the misdemeanor possessing a firearm as a juvenile conviction to comport with the applicable statute. *See* Code § 18.2-11; *Belcher v. Commonwealth*, 75 Va. App. 505, 529-31 (2022) (noting that the difference between "twelve months" and "one year" affects sentences in various ways and remanding for resentencing when the court erroneously sentenced appellant to a one-year sentence on a misdemeanor offense).

A "criminal defendant . . . is entitled to a new sentencing hearing" where "a sentence [is] imposed in violation of a prescribed statutory range of punishment." *Rawls*, 278 Va. at 221. Therefore, we vacate Lennon's sentence for maliciously shooting at an occupied vehicle, which should be corrected to the jury's actual conviction for unlawfully shooting at an occupied vehicle, and also his sentences for attempted robbery causing death and possessing a firearm as a juvenile, and remand to the trial court for a new sentencing hearing on those offenses. *See Graves v. Commonwealth*, 294 Va. 196, 208 n.6 (2017) (when multiple sentences are contained in a sentencing order and only certain sentences are void ab initio, the remainder of the sentences continue to be valid).

CONCLUSION

For these reasons, we affirm Lennon's convictions but vacate the trial court's sentence in part. We remand the for resentencing and correction of the record consistent with this opinion.

*Affirmed in part, vacated in part, and remanded.*